United States District Court
For the Northern District of California

1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   SOLADIN KAING, as an individual    ) Case No. 09-5057 SC
    and on behalf of all others        )
8   similarly situated,                ) ORDER GRANTING MOTION TO
                                        ) DISMISS
9                     Plaintiff,        )
                                        )
10                                      )
            v.                          )
11                                      )
                                        )
12  PULTE HOMES, INC.; PULTE HOME       )
    CORPORATION, and PULTE MORTGAGE     )
13  LLC,                                )
                                        )
14                    Defendants.       )
                                        )
15  _____    )

16  I.   **INTRODUCTION**

17       This is a putative class action suit brought by Plaintiff

18  Soladin Kaing ("Plaintiff") against Defendants Pulte Homes, Inc.

19  ("PHI"), Pulte Home Corporation ("PHC") and Pulte Mortgage LLC

20  ("PM") (collectively, "Defendants" or "Pulte").  Defendants PHC and

21  PM have filed a Motion to Dismiss for lack of standing and for

22  failure to state a claim upon which relief can be granted.  Docket

23  No. 16 ("Motion").  PHI has also joined in this Motion.  See Docket

24  No. 14 at 7-8.  This Motion is fully briefed.  Docket No. 24

25  ("Opp'n"), 30 ("Reply").

26       Having considered all of the papers submitted by the parties,

27  the Court concludes that Plaintiff lacks standing to assert each of

28  her causes of action against Defendants.  For the reasons stated

1  below, the Court hereby GRANTS the Motion to Dismiss.

2

3  **II.   <u>BACKGROUND</u>**

4       PHI and its subsidiaries are variously engaged in the business

5  of building and selling homes, as well as financing the purchase of

6  homes by its customers.  <u>See</u> Docket No. 1 ("Compl.") ¶ 1.

7  Plaintiff alleges that PHI "provide[s] 'one-stop shopping' where it

8  not only builds homes but it also provides virtually all of the

9  services needed to complete a home sale, including in-house sales

10  agents, financing, ancillary settlement services and appraisals."

11  <u>Id.</u>  PHI is incorporated in, and headquartered out of, the State of

12  Michigan.  <u>See id.</u> ¶ 10.  PHC is an operating subsidiary that is

13  directly engaged in the business of home building, and which

14  regularly engages in business in the State of California.  Compl.

15  ¶¶ 10, 12.  PM is a subsidiary owned by PHC, which "is the lending

16  arm of Pulte Homes, Inc.," and which also maintains offices and

17  does business in California.  <u>Id.</u> ¶¶ 10, 13.

18       In or about February of 2006, Plaintiff purchased a new house

19  from Defendants, located in Lathrop, California.  Compl. ¶ 49.  The

20  house was located in a subdivision called Mossdale Landing, in

21  which many or most of the homes were built, sold, and financed by

22  Defendants.  <u>See id.</u> ¶ 2-4, 16.  Plaintiff claims that "Defendants

23  marketed the house in the Pulte Aerial of Mossdale neighborhood as

24  stable and desirable."  <u>Id.</u> ¶ 49.

25       According to Plaintiff, she used one of Pulte's in-house sales

26  agents to purchase the property.  <u>Id.</u>  She says that she was

27  "encouraged by Pulte Homes to use Pulte Mortgage to finance the

28  house," and was "provided significant financial incentives" to do

**United States District Court**
For the Northern District of California

so.  Id. ¶ 50.  In particular, she was told that she would be
entitled to a $75,000 price reduction if she utilized PM.  Id.
¶ 53, 55.  When she inquired about whether she could instead use
Bank of America to finance the mortgage, she was told that she
would not receive this "discount" unless she used PM.  Id. ¶ 53.
Although she was told that the contract price of the house was
$575,365, she claims that "Pulte knew from appraisals on other
homes in the subdivision, that the house was worth less than
$500,000."  Id. ¶ 55.  Pulte selected an appraiser, whom Plaintiff
claims was dependent upon Pulte for much of its business, and who
allegedly was under pressure to provide "inflated and pretextual"
appraisals.  Id. ¶ 51.  The appraiser valued the house at $518,000,
which (according to Plaintiff) proves that the $575,365 price
offered, as well as the $75,000 discount, were "phony numbers from
the start."  Id. ¶ 55.  Plaintiff ultimately purchased the house
for $518,215, with charges totaling $531,972 after settlement fees.
Id. ¶ 56.  Plaintiff paid a total of $103,643 as a down payment,
and financed the rest through a loan from PM.  Id.

According to Plaintiff, she "would not have and could not have
qualified for her loan" if she had been working with a "lender
acting in good faith in an arms-length transaction."  Id. ¶ 57.
Her monthly income was less than $3500, which she told PM when she
was applying for the mortgage.  Id. ¶ 53.  She notes that her
income was listed as "0" on the mortgage application provided to
her at closing.  Id.  Plaintiff also claims that no explanation of
the terms of the loan was provided to her, and no lender was
present to answer her questions when she executed the agreement.
Id. ¶ 52.  Nevertheless, Plaintiff has not indicated that she has

been unable to make her regular payments on the mortgage, nor does she allege that she has been harmed by any of the terms in the loan documents to which she is a party -- although she does state, in passing, that she has sought to modify the terms of her loan to avoid foreclosure proceedings.  Id. ¶ 58.

Plaintiff instead argues that she has been harmed by Defendants' failure to:

> provide Plaintiff with any disclosure that Defendants had sold houses, and would sell houses in the future, to unqualified and high-foreclosure-risk buyers.  Defendants also did not disclose that they had sold houses, and planned to sell houses in the future, to investors who would not occupy the houses or to owners who were not financially qualified.

Id. ¶ 61.

Plaintiff claims that Defendants' regular practice was to sell houses in Mossdale Landing and other neighborhoods to unqualified purchasers (as well as to investment purchasers) through subprime loans and questionable loan practices.  Id. ¶¶ 20-22.  Plaintiff argues that Pulte knew that "its practice would invariably lead to loan defaults and foreclosures," and that these foreclosures had a "devastating" impact on the value and desirability of the neighborhoods.  Id. ¶¶ 22-27.  Yet Pulte "marketed the neighborhoods as stable and desirable neighborhoods while becoming even more aggressive in selling homes to unqualified and high-foreclosure-risk buyers, in order to prop-up demand and sales prices and continue receiving ever-increasing profits."  Id. ¶ 28. According to Plaintiff, Pulte's practices resulted in increasing foreclosure rates in Mossdale Landing and other Pulte neighborhoods, as its high-risk customers began defaulting on their

**United States District Court**
For the Northern District of California

1   loans.  <u>Id.</u> ¶ 31.  Plaintiff believes that her home decreased in

2   value by over 50%.  <u>Id.</u>

3       Plaintiff now seeks to represent a class of individuals who

4   have purchased homes from Pulte.[1]  She raises four causes of

5   action: (1) violation of sections 17200 <u>et</u> <u>seq.</u>, of the California

6   Business & Professions Code ("§ 17200"); (2) violation of

7   California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750

8   ("CLRA"); (3) negligent misrepresentation; and (4) breach of an

9   implied covenant of good faith and fair dealing.

10

11  **III. <u>LEGAL STANDARD</u>**

12      PHC and PM argue that Plaintiff has no standing to bring this

13  suit, and seek dismissal under Rule 12(b)(1) of the Federal Rules

14  of Civil Procedure.  Federal Courts are limited to review of actual

15  "Cases" and "Controversies," as set out in Article III, section 2

16  of the Constitution.  <u>See</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S.

17  555, 560 (1992).

18          [T]he irreducible constitutional minimum of
            standing contains three elements.  First, the
19          plaintiff must have suffered an "injury in fact"
            -- an invasion of a legally protected interest
20          which is (a) concrete and particularized, and (b)
            actual or imminent, not "conjectural" or
21          "hypothetical."  Second, there must be a causal
            connection between the injury and the conduct

22

23  [1] Plaintiff defines the proposed class as follows:

24          All purchasers of homes from Pulte Home from
            January 1, 2005 through March 1, 2007, who lived
25          in such homes and still own or who sold their
            home or who lost their home through judicial or
26          non-judicial foreclosure and whose property is in
            the state of California in a "neighborhood" or
27          "Community" as defined by Pulte Home.

28  Compl. ¶ 65.

**United States District Court**
For the Northern District of California

1   complained of -- the injury has to be fairly
2   traceable to the challenged action of the
    defendant, and not the result of the independent
3   action of some third party not before the court.
    Third, it must be "likely," as opposed to merely
    "speculative," that the injury will be redressed
4   by a favorable decision.

5   Id. at 560-61 (internal quotation marks and citations omitted).

6   The Plaintiff has the burden of establishing these elements, and at

7   this stage of the litigation, "general factual allegations of

8   injury resulting from the defendant's conduct may suffice."  Id. at

9   561.

10

11  **IV.   DISCUSSION**

12      PHC and PM contend that Plaintiff lacks standing to bring this

13  suit.  In particular, they claim that Plaintiff has failed to

14  allege an "injury in fact," and that whatever speculative injury

15  Plaintiff has alleged is not "fairly traceable" to Pulte's actions.

16  Mot. at 11.

17      As Plaintiff points out, she has attempted to set forth two

18  distinct theories of harm stemming from Pulte's conduct: "first,

19  due to Defendants' scheme, Plaintiff paid an inflated purchase

20  price for her home," and "[s]econd, due to Defendants' deceptive

21  marketing and lending practices, Plaintiff and the class have

22  suffered a decrease in property value" that is "greater than has

23  been suffered by houses in the surrounding areas."  Opp'n at 7-8;

24  Compl. ¶¶ 55, 64.  The Court will analyze each type of harm

25  separately to determine if it constitutes an injury caused by

26  Defendants, that suffices to give Plaintiff standing to sue.

27      **A.    Plaintiff's Bait-and-Switch / Overcharge Theory**

28      Plaintiff alleges that Pulte represented that the contract

sale for the house was $575,000, with a $75,000 discount that was "illusory" because the house was either "worth less than $500,000" or "at best $518,000." Compl. ¶ 55. She describes this as a "bait-and-switch" tactic that induced her to "act fast" and receive financing from PM rather than Bank of America. Id. ¶¶ 54-55. Plaintiff also states that, "prior to closing, the house was appraised by Pulte at $518,000." Id. at 55. Plaintiff integrates this theory into her first two causes of action, for breach of § 17200 and the CLRA. Id.[2]

The Court finds that it can resolve this issue solely on statutory, rather than Constitutional, standing grounds. Courts have held that, in some contexts, bait-and-switch tactics similar to the one alleged by Plaintiff can cause an overpayment-type injury in fact to plaintiffs. See, e.g., Laster v. T-Mobile United States, Inc., 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005) (holding that "bait-and-switch" advertising tactic suffices to establish injury in fact under § 17200, but that plaintiff failed to plead reliance). Presumably, if Pulte had applied the stated discount to the genuine value of the house, Plaintiff would have paid only $443,000 or less ($518,000 minus the $75,000 discount). However, standing under § 17200 requires more than mere allegations that a defendant engaged in fraudulent or deceitful business practices.

---

[2] This Court reads Plaintiff's overpayment theory to rest solely upon the alleged misrepresentations of value as outlined in the complaint. Compl. ¶ 55. Plaintiff also alleges that Pulte offered subprime loans to support "the creation of an artificial housing demand and artificial willingness to pay above-market rates." Compl. ¶ 21. As the Court reads the Complaint, Plaintiff appears to have included these statements only to describe Pulte's motives for issuing subprime loans. To the extent that Plaintiff intended to allege that she overpaid as a result of Pulte's efforts to artificially increase housing demand by offering subprime loans, the Court rejects this line of argument as far too speculative.

United States District Court
For the Northern District of California

Standing also requires a plausible claim of causation, which in turn requires a showing of reliance. See Cal. Bus. & Prof. Code § 17204 (limiting private right of action to those who have "suffered injury in fact and has lost money or property as a result of the unfair competition"); Hall v. Time Inc., 158 Cal. App. 4th 847, 856-57 (Ct. App. 2007) (discussing cases that have addressed reliance as prerequisite to standing under § 17200).

In one sense, Plaintiff does plead that she relied upon Defendants' claims that the contract price of the house was $575,000 -- she claims that she would have used Bank of America to finance the purchase but for the "discount" offered by Defendants. Compl. ¶ 54.  However, she does not suggest that she was injured by her use of PM rather than Bank of America.  More importantly, she does not claim that she paid the price she paid, or purchased the home, because of Pulte's initial representations.  Nor could she plausibly do so.  Any claim of reliance upon Defendants' initial representation would be directly contradicted by her claim that she received an appraisal prior to closing, and learned that the house was appraised around $518,000.  See id. ¶ 55.  Because she knew that the house was worth less than the initial contract price stated by Defendants before closing, she cannot plausibly claim that she relied on the higher initial representation.  The timely appraisal undercuts any claim that she "lost money or property as a result of the" alleged misrepresentation.  C.f. Cal. Bus. & Prof. Code § 17204.  She has not pointed to any other loss or injury that she suffered as a result of Defendants' alleged misrepresentation as to the contract price of the house.  She therefore has no standing to sue under § 17200.

8

Plaintiff lacks standing to sue under the CLRA for the same reason: without a plausible claim that she suffered an injury "as a result of" the offending conduct, there is no standing to sue under the CLRA. Cal. Civ. Code § 1780(a). In addition, application of the CLRA is explicitly restricted to those who engage in a "sale or lease of goods or services." Cal. Civ. Code § 1770. The CLRA does "not apply to any transaction which provides for the construction, sale, or construction and sale of an entire residence . . . with or without a parcel of real property or an interest therein . . . ." Id. § 1754. Even though the $75,000 "discount" was established to induce Plaintiff to use PM rather than other lenders, Plaintiff's "bait-and-switch" allegations relate exclusively to the purchase price of the house, rather than the ancillary services provided by PM. Put otherwise, Plaintiff claims that she overpaid for the house, and not the financial services. Consequently, this theory is not grounded in a "sale or lease of goods or services" as defined by the CLRA, and she lacks standing to assert her bait-and-switch theory to establish an injury under the CLRA.

The Court therefore finds that Plaintiff lacks statutory standing to pursue her bait-and-switch theory under either her first or second causes of action.

**B.    Plaintiff's Reduced-Value Theory**

Throughout her Complaint and four causes of action, Plaintiff's primary theory is that she has been injured because Pulte's lending practices caused widespread foreclosures in her neighborhood, and this has driven down the value of her house.[3]

---

[3] Because this theory is integrated into four causes of action, including common law causes of action for negligent

**United States District Court**
For the Northern District of California

1   This theory raises questions as to whether Plaintiff suffered a

2   Constitutionally cognizable injury in fact, and whether any such

3   injury was fairly traceable to Pulte's actions.   Plaintiff argues

4   that she can establish an injury in fact merely by pleading that

5   the house has diminished in value.   Opp'n to Mot. at 6.

6        To support her position, Plaintiff cites to Friends of the

7   Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., in which

8   the Supreme Court cited a reduction in home values, among various

9   other injuries, in finding that plaintiffs had standing to sue a

10  polluter for violating the Clean Water Act.   528 U.S. 167, 182-83

11  (2000).   It is true that a diminution in the value of a house

12  caused by a change in that houses surrounding environment may

13  generally comprise an "injury in fact" for constitutional standing

14  purposes.   See, e.g., Tyler v. Cuomo, 236 F.3d 1124, 1132 (9th Cir.

15  2000) (finding that homeowners had standing to sue government

16  entities over housing project, under the National Environmental

17  Policy Act and National Historic Preservation Act, because their

18  "homes are directly affected by changes to structures in the

19  neighborhood").   However, Plaintiff has not alleged that Pulte has

20  injured her by altering the physical environment around her house -

21  - only that Pulte has altered the general economic conditions of

22  her neighborhood.   Pulte's practices affected the value of

23  Plaintiff's house because they caused foreclosures and short sales,

24  which "become the new comparative sales values for the

25  neighborhood, which result in a vastly lower market rate."   Compl.

26

27  misrepresentation and breach of an implied covenant of good faith
    and fair dealing, the Court will examine whether Plaintiff meets
28  the standing requirements grounded in Article III of the
    Constitution, rather than individual statutes.

¶ 26.   These practices allegedly "result[ed] in abandoned houses; multiple families living in one home; transient neighbors with no long-term ties to the neighborhood; unfinished yards and unkempt yards; and, in some cases, increased crime." Id. ¶ 27.

Compared to a diminution in value that is tied to a physical change to the neighborhood's environment, such as pollution or the construction of a new housing project, a decline in value that is tied to a purely economic change to a neighborhood is much more difficult to characterize as "concrete and particularized, and actual or imminent." See Lujan, 504 U.S. at 560-61.   Such economic conditions are likely to change with the broader economy, and any decline in housing value can potentially evaporate before Plaintiff has suffered a concrete injury, even in the absence of redress from the courts.   Given that Plaintiff has not sold, or even attempted to sell, her house under these new economic conditions, it is not clear that the diminished value of her house is cognizable as an "injury in fact."

As one court considering a similar complaint has articulated:

> Since the reduced value about which Plaintiffs complain would have resulted from an economic glut of supply, then such harm is only realized if Plaintiffs sell their home during such glut. If Plaintiffs chose to remain in their home until more favorable economic conditions arrive, then they will have realized no loss at all.

Tingley v. Beazer Homes Corp., No. 07-176, 2008 U.S. Dist. LEXIS 34303, *14 n.3 (W.D.N.C. Apr. 25, 2008).   The type of injury that Plaintiff alleges "is of a type which would not necessarily have a long term impact on home prices."   Green v. Beazer Mortgage Corp., No. 07-1098, 2007 U.S. Dist. LEXIS 66887, *7 (D.S.C. Sept. 10, 2007) ("Plaintiff does not . . . suggest that she or any of her

United States District Court
For the Northern District of California

1 other similarly 'injured' neighbors have realized this decrease in
2 value (e.g., as a result of sale of the home).  Thus, the injury is
3 neither concrete nor particularized.").  Consequently, this Court
4 finds that Plaintiff has failed to articulate an injury in fact
5 that is "concrete and particularized, and actual or imminent."
6 C.f. Lujan, 504 U.S. at 560-61.

7      Plaintiff faces a similarly insurmountable problem with
8 respect to the causation element of standing.  "[T]he injury has to
9 be fairly traceable to the challenged action of the defendant, and
10 not the result of the independent action of some third party not
11 before the court."  Lujan, 504 U.S. at 560-61.  Any loss in value
12 that Plaintiff has suffered has resulted not just from the actions
13 of Pulte, but also from the independent actions of all of the
14 various residents of Plaintiff's neighborhood.  She alleges that
15 Pulte entered into a myriad of independent contracts with each
16 independent homeowner; these homeowners independently defaulted and
17 independently decided to allow foreclosure, and this collectively
18 had an impact on the value of her home.  Plaintiff's theory
19 therefore depends upon a chain of causation that is dependent upon
20 many factors, "such as unemployment, health problems, a general
21 weakening economy, or other financial conditions," the decisions of
22 various homeowners to foreclose rather than refinance,[4] as well as
23 other economic factors that can have unpredictable effects on the
24 housing market.  Tingley, 2008 U.S. Dist. LEXIS 34303 at * 11-12.
25 Any injury suffered by Plaintiff therefore necessarily depends upon

26
27 [4] Plaintiff demonstrates that foreclosure has not been an
inevitable consequence of Pulte's practices; she herself received
financing through PM but has apparently not entered into
28 foreclosure, even though Pulte was allegedly irresponsible in
financing her loan.  See Compl. ¶¶ 57, 58.

Case 3:09-cv-05057-SC   Document 38   Filed 02/18/10   Page 13 of 13

1   a causal chain that includes numerous individual decisions of "some

2   third part[ies] not before the court."   Lujan, 504 U.S. at 560-61.

3        This Court therefore finds that Plaintiff has no standing to

4   sue for any subsequent reduction in value of the house resulting

5   from the economic consequences of Pulte's practices.

6

7   **V.    CONCLUSION**

8        This Court finds that Plaintiff lacks statutory standing to

9   sue Pulte for its alleged bait-and-switch scheme.  The Court

10  further finds that Plaintiff would be unable to amend her pleadings

11  so as to correct these deficiencies without directly contradicting

12  the pleadings set forth in her initial Complaint.  Consequently,

13  Plaintiff's first and second causes of action are DISMISSED WITH

14  PREJUDICE as to Plaintiff's bait-and-switch allegations.

15       This Court further finds that Plaintiff lacks constitutional

16  standing to assert any cause of action based on a theory that

17  Defendants harmed her by causing her house to depreciate in value.

18  Consequently, all of Plaintiff's remaining causes of action are

19  DISMISSED WITH PREJUDICE.

20       Defendants' Motion to Strike, Docket No. 18, and the Motion to

21  Dismiss filed by Pulte Homes, Inc., Docket No. 14, are both DENIED

22  as moot.

23

24       IT IS SO ORDERED.

25

26       Dated: February 18, 2010

27                                    UNITED STATES DISTRICT JUDGE

28